Yes, thank you very much and good morning, your honors. May it please the court. My name is James Risfet. I'm an attorney with the Consumer Justice Law Firm representing the appellants Jessica and Corey Davis. This matter comes to the Ninth Circuit on appeal from grant of summary judgment in favor of PNC Bank disposing of appellant's causes of actions under the Federal Fair Credit Reporting Act and ancillary claims under California's Rosenthal Act. Generally speaking, the issues before the Ninth Circuit on appeal largely relate to questions of accuracy or rather inaccuracy of PNC Bank's credit reporting with respect to an automobile loan taken out by the Davises in mid-2021 with PNC Bank's predecessor in the interest of BBVA. As your honors likely know, under the FCRA... Counsel, why don't you tell me how the record indicates that the loan was paid off? Certainly. So, ultimately, some of the foundational issues that arose throughout the course of discovery are that PNC at all times has insisted on trying to turn this case into a sort of math problem where simple arithmetic can dispose of the questions of fact. The issues that we identified are that ultimately the documents that PNC has produced lack any reliability sufficient to actually understand how the accounting... Let me ask it again, Counsel. Let me say it this way. Does Melissa Jones's declaration indicate that the loan was paid off? Yeah. So, Melissa Jones's declaration indicates that Gravity Lending received a payoff amount quote from BBVA or dealer track, a third-party software, and that ultimately Gravity Lending paid that amount plus an additional $150 to account for any overages, additional accrued interest, things of that nature. I thought, Counsel, that the record reflects that when you add up... It's a question of mathematics, right? So, if we agree with the district court's calculations, then you lose in this case. So, mathematically, I thought that the total payments is still less than the amount of the original loan, even excluding interest. Well, and the foundational issue, Your Honor, is that ultimately we don't have any understanding of how BBVA accounted for payments or how BBVA accounted for any of the information prior to the acquisition. But don't we know the amount of the original loan that's undisputed and the amount of payments that your clients made? We do, but there are ultimately, Your Honor, issues surrounding other foundational questions of the accounting. For instance, the gap refund amount of $600 never accounted for anywhere within any of the accounting documents that PNC has produced. Therefore, we have no understanding as to whether or not that $600 was accounted for by BBVA. But some employee put in that figure after it was transferred, correct? And which figure are you referring to, Your Honor? The 600 figure. Our understanding, or at least the way that discovery bore out in this case, is that following the acquisition of BBVA's United States Banking Holdings by PNC, at some point, this mystery $650.85 figure was added to the accounting for that loan and then retroactively backdated to a date prior to the payoff payment being made. When I questioned PNC Bank's corporate representative, who presumably prepared specifically to discuss this figure, he had no knowledge about whether or not that line item would have retroactively added that $650.85 or subtracted that from the amount of the loan. So ultimately, the issues surrounding the math, again, the accounting here is anything but neat and tidy. So do we know how, I mean, here's the question. So do we know how that was added, number one? And number two, if we don't know that, then isn't it a question of fact as to how that figure was added to this amount so that we can then do the math? Yes. Ultimately, Your Honors, I would agree that it is a question of fact. To answer your first question, no. To date, PNC has never been able to explain how that mystery figure wound up into this accounting or the significance of that mystery figure as it relates to the accounting of this loan. So our ultimate contention is yes, Your Honor, I agree. It is a question of fact for the jury to decide whether or not. But question, I go back to my original question. If it's a question of mathematics, then the court can also do the addition. I mean, none of us went to law school because we're very good at mathematics, but I think we can do basic arithmetic. So it's summary judgment, so you do get the benefit of inferences in your favor. If we take the disputed amount, add that to the total amount paid, would that exceed the original loan amount plus interest? I don't think it does. Well, and ultimately, not accounting for the $600 gap refund, there are still questions about how that accounting would have shaken out, how interest would have been accrued with respect to that $600 gap refund. And there are also other foundational questions that circumstantially seem to evidence PNC, or at least BBVA, treated this loan as having been satisfied. The terms of the loan agreement make clear that when a payment is received, it is always applied in a very specific manner, outstanding interest first, then any remaining- But maybe it was a mistake. Maybe it was a mistake. And maybe they said this was paid off, and it really wasn't. And here, we have someone from PNC coming in and correcting what is or what is not owed. And ultimately, then, the judge did the correct math here. Why isn't that right? Well, I think ultimately, not having any of the documents from BBVA and not having any of the accounting for how BBVA tallied up this loan, how they made whatever determination they made as to a payoff quote, we don't and fundamentally cannot know whether BBVA gave a different amount because they came to some conclusion that that was the correct amount owed, and they disposed of the loan at that point, and then PNC sort of retroactively fixed it. Those are foundational questions PNC has no idea about, because they concede that they have no information about the manner in which this loan was treated prior to their acquisition of BBVA. Before you run out of time, counsel, let me move you on to another issue. Because under the statute, a basis for liability can arise from false information or misleading information. Did you preserve the misleading theory? Yes, Your Honor. And in fact, I think probably the central issue here on appeal is that ultimately, the district court judge refused to consider questions about whether or not PNC Bank's reporting was misleading based on the district court's view that appellants had not sufficiently pleaded allegations to support such a cause of action in the text of their complaint. I think that this court's holding in Gorman makes clear that inaccurate information under the FCRA consists of two subsets of information, as Your Honor just noted, information that's patently incorrect and... So your argument for preservation is really just and I did find a couple of passing, pretty conclusory references in the complaint. You're saying that that's enough? Did you do anything during discovery or the litigation of this case to suggest to opposing counsel that that was an alternative theory that you were going to try the case on? So I would respond by saying, number one, yes, that the question as to whether PNC's reporting was misleading has at all times been front and center and been subject to discussions in both mediation, it was the context, or there were contextual questions about whether PNC's reporting was misleading throughout PNC's deposition and throughout Experian's deposition as well. So that fact imputed to PNC by knowledge of its counsel has been front and center throughout this litigation for going on two years now. The other item I would note, Your Honor, and I would just take issue slightly with the phrasing is that ultimately, I don't believe this to be an alternative theory of liability. I think that the text of Gorman makes clear that either the patently incorrect or the materially misleading standard, those are two subsets of inaccurate information. In other words, when a consumer... But if we disagree with you on your math, then what was materially misleading? The failure to report a dispute? Is that what made it materially misleading? I think the failure to report the dispute and additionally, the failure to provide any sort of context in PNC's reporting as to the potential role of BBVA and or PNC, or even arguably gravity lending. Ultimately, PNC has no knowledge about what those communications between gravity lending and BBVA were, but the fact is credit reporting and the credit reporting system exists so that creditors can communicate with other creditors and prospective creditors about... But if PNC got out the calculator and ran the math and said, they still owe us $700, $800, this whole thing about a dispute, although the communications have been unclear, it's not a bona fide dispute that we need to report. Why isn't that correct? Certainly, Your Honor. And ultimately, I know the portion of PNC's responding brief that you're misunderstand Saunders and the meritorious dispute standard. PNC's brief seems to intimate that the concept of a meritorious dispute refers to a dispute literally being successful. In other words, in order for a furnisher to be obligated to report the existence of a meritorious dispute, it would therefore follow that the consumer must have been successful or likely to be successful in their dispute. That is not what Saunders says. Saunders says that if ultimately there is a question for the jury to decide about the dispute, in the case of Saunders, the issue was the consumer clearly hadn't paid and it was agreed that the consumer had not paid. Nonetheless, because of the conduct of the creditor, which by the way, is virtually identical to the conduct of PNC here, in that case... That conduct being misleading the borrower into thinking that they had paid off. Correct. And on multiple instances in both Saunders and here, there's a communication from the creditor saying, you're good, you don't owe us, you're fine. Ultimately, what Saunders says is if a consumer's conduct and their derogatory or delinquent payments under the FCRA are not as a product of that consumer's financial irresponsibility, then failing to include information about a bona fide dispute, which in that case, the court said, if there is a basis for the jury to conclude that consumer was excused or justified in withholding payment, similar to the conduct here, almost identical, then in that case, Saunders says, you have to report to someone. It's more than just this person being a deadbeat. It's that they had a legitimate gripe with the amount that they reportedly owed. Did you want to save a little time for rebuttal, Counselor? I do. I'll be saving three minutes for rebuttal, Your Honors. Thank you very much. Good morning, Your Honors. Brian Pano appearing on behalf of the respondent, PNC Bank. I don't want to regurgitate the briefs. I can tell by the court's line of questioning that the court is very familiar with the facts. As Counsel's argument and briefs demonstrate, I think one of the fundamental issues here is whether or not the theory that PNC's credit reporting was materially misleading was properly pled and preserved. Our position, while Gorman may say a credit reporting claim may lie where reporting is materially misleading, Gorman doesn't say that a plaintiff is absolved from the responsibility under Rule 8 from actually pleading facts to support that theory. And in this particular case, the very clear theory and singular theory that's pled throughout the complaint is that the credit reporting was patently inaccurate. In fact, the complaint does say patently false or misleading in several instances. So then the question is, how are you prejudiced by the course of the litigation in this case? There are lots and lots of statutes that really set up alternative claims where the discovery tactics and the litigation strategy would really be different if one side knows that the other side is advancing dual theories. But here, patently false and misleading, they're so close. They're like two sides of the same coin. So can you give us some insight into how you were prejudiced? Because I think that's what the district court thought, that this came up in the course of summary judgment briefing and litigation. So your side didn't have enough time to pivot and prepare for that. But I would think that in a case like this, discovery would look pretty much the same. Some of the discovery, I would agree, Your Honor, would be the same. But from a broader perspective, the pleaded theory shapes and informs a defendant's decisions throughout a case. Right. And that's a fair point. And that's what I'm trying to learn more about. Like, how did you shape your strategy any differently had you known that? So their theory is that, look, and it's not unsympathetic facts, right? Lots of us set up auto pay, and then companies change and refinance, and then eventually you just lose track of things. And so, you know, on the one hand, they said, well, I think my math is correct. And you say, well, no, my math is more correct. But having to fight with credit reporting that you think is inaccurate, I just can't imagine what you would have done differently in terms of defending this case. Well, I think it has to, I mean, for some examples, I think it first and foremost dictates the exposure analysis in the case. You know, any time a case comes across my desk, you look at the facts, they're pled, you compare it to your client's records. All right, so the settlement value assessment would be different, but what about the course of litigation? In the course of litigation, and as the district court noted, is without having pled that theory, we had no opportunity to test the theory through motion practice. The first time it came up was in the context of the summary judgment motion. But fundamentally, from a discovery perspective, it shaped the scope and extent of discovery. Hold on, you were shocked, shocked that this was going to be their theory? I mean, how can that be the case? You knew exactly what their theory was because they've been telling you out, hey, we paid this amount, this is wrong. Well, I guess I would disagree in the sense that the theory that was pled in the complaint, and from my perspective, the theory that was advanced in discovery, including in written discovery responses, was of a patently incorrect nature, not this materially misleading theory. And when we drafted the motion, we focused on the theory that was pled in the complaint and was carried over into the written discovery responses. Had we understood the theory to have included the materially misleading theory, we would have expanded on discovery efforts. We would have pursued more extensive third-party- But I'm not hearing how. I'm not hearing how you would have expanded it. I mean, I take your point on settlement value and all that, but in terms of litigation strategy, I just don't know what questions you would have asked or what factual areas were undeveloped because you think that they now have shifted theories on you, right? Do credit agencies have an obligation to report when an item's in dispute, in active dispute? So there is, and that's been touched on in this case, is that there was error in failing to report that there was a dispute. Our position is that unless it's a bona fide dispute, there's no reason to report the dispute. And one other fundamental issue in this case that I think is important to address is, and it's been touched on in some of the questions that the court has had, is really at bottom, the appellant's theory is it is an attack and a challenge to the validity of the debt, not on a factual basis, but on a legal basis. What is the legal consequence of PNC making a representation about the status of the debt? What is the legal consequence of PNC having provided, allegedly having, or its predecessor, excuse me, having provided a payoff quote that may have been erroneous or incorrect? Those are legal determinations, and that's not, and other circuits have recognized that the credit reporting system, including the dispute resolution system, is not designed to turn credit furnishers, or even the bureaus, the credit reporting agencies, into fact-finders or tribunals. And that's essentially what the plaintiffs are seeking to do here. They're trying to impute onto PNC a duty to have essentially resolved a legal dispute as to whether or not certain conduct resulted in the legal satisfaction of the debt. What's your theory about why Gravity cut a check to BBVA for 58, 69, 694, and 61 cents, unless it was, in fact, to do a payoff? As we sit here today, and I think, I don't know. I don't know how the payoff was not on BBVA letterhead. The payoff was generated, in some capacity, through Gravity. We, to this day, don't know where those numbers came from. But I don't think it's necessarily material, because at the end of the day, the provision of an erroneous payoff quote doesn't discharge or satisfy the underlying debt obligation. But doesn't it set you up for a bona fide dispute that you should have reported to the agencies? I would argue that that, in the nature of a legal dispute, not a factual dispute. And for that reason, it falls, at the end of the day, that the credit reporting agencies are charged with conducting a reasonable investigation. And a reasonable investigation, as other circuits have recognized, entails, it requires the creditor to be able to verify something through objectively and reasonably available means. And in this particular case, PNC was put in the position of essentially having to resolve a question of law as to the impact of certain conduct short of full payment of the loan on the actual discharge. Are there any cases that have interpreted that bona fide dispute phrase in the way that you're arguing? That it's only supposed to consider factual disputes, not legal disputes? Well, the Fourth Circuit has recently issued an opinion in Roberts v. Carter Young, where it touches on this. And it refers to decisions from other circuits, including the Eleventh Circuit. There's a series of cases in the Eleventh Circuit involving holiday and time shares and credit disputes relating to a specific provision within that contract that certain borrowers or consumers argued discharged or canceled the contract. And the Court in the Eleventh Circuit in the holiday line of cases touches on that standard. The dispute has to be something that a furnisher can resolve through objective and reasonably available information. And if we disagree with you that the complaint fails to allege this alternative theory, do we need to address this argument? Or would that be something we would remand and let you all hash out in the district court? I think the district court didn't address that particular issue. I think, if my recollection is correct, I think this court potentially has the ability to resolve that question on appeal. But it certainly would be within this court's discretion to remand for the district court to actually make a determination on that particular aspect of the case. So unless the Court has any other questions, I think I'll leave it at that. Thank you very much, counsel. Thank you, Your Honor. May it please the Court. I'll quickly go through a few items I wanted to with respect to counsel's statements. Number one, Your Honor, I agree with you concerning the questions surrounding prejudice to PNC. Stated plainly, there is none. The district court asked PNC what the prejudice was at the motion for summary judgment hearing. They identified two things. Number one, we've already spent all this time on our summary judgment motion. Number two, perhaps we would have done something differently in discovery with the same vagueness that counsel just stated. The reality is the standard for arguing prejudice requires specificity. You must be specific with respect to what discovery. And in fact, I would argue the appellee brief demonstrates that there is no prejudice because PNC makes reference to, oh, we would have done some sort of discovery with the creditors to which Mr. and Mrs. Davis applied to see how they understood this misleading information. Erickson and the Eleventh Circuit is directly on point. The question of whether information is misleading under the FCRA is not a subjective standard. It is an objective standard, meaning what those creditors subjectively understood is irrelevant to the question of whether or not the information is misleading. It is relevant, potentially, to the question of the Davis' damages. We know that PNC would not have done discovery on the damages because they didn't. Ultimately, there is no prejudice at all. Dole in the Third Circuit also completely forecloses PNC's argument that while we spent this time on our MSJ briefing, Dole says that's insufficient for you to claim prejudice. I'll also note that the line of cases that counsel is referring to concerning readily and objectively verifiable, it all stems from in the Second Circuit. These are consumer-friendly cases. And frankly, it's the first time I've ever heard a furnisher or consumer reporting agency argue in favor of them. But I would agree that should be the standard objectively and readily verifiable as to whether information is inaccurate or not. However, as to Your Honor's point, PNC is flat out wrong when it asserts that a dispute must be successful in order for it to be a meritorious dispute. The standard addressed under Saunders makes clear it does not necessitate that the consumer ultimately be successful. In fact, there's a holding in Saunders that explicitly says it matters not even if ultimately the case were the consumer lost that dispute in a trial. The last thing I wanted to touch on is reverting back to prejudice. There is case law in circuit courts, the Fourth Circuit I know for certain Davis v. Piper aircraft, that flat out says if the allegations at issue were in the complaint, there is no prejudice. None of the allegations have changed, whether it's a patently incorrect information or materially misleading argument. Unless Your Honors have anything further. All right. Thank you very much, counsel, to both sides for your argument this morning. The matter is submitted.
judges: NGUYEN, MENDOZA, UNKNOWN